In the Interest of C.V.M., N.V.M. and J.V.M., Minor Children.

T.P. and K.V.M., Appellants.

No. 91–475.

Court of Appeals of Iowa.

Oct. 29, 1991.

Timothy D. Ament of Gartelos & Wagner, Waterloo, for appellants.

Bonnie J. Campbell, Atty. Gen., Charles K. Phillips, John M. Parmeter and Kathrine

S. Miller–Todd, Asst. Attys. Gen., for appellee State.

Heard by SCHLEGEL, P.J., and HAYDEN and SACKETT, JJ.

HAYDEN, Judge.

T.P. and K.V.M. are the father and mother of four children. The youngest child remains with his parents and is not involved in this case. Although not formally married, the parents have lived together for several years.

In April 1988 the three oldest children, C.V.M., N.V.M., and J.V.M., were adjudicated children in need of assistance because their parents failed to supply them with adequate food, shelter, and clothing. At the time of the adjudication the children were six, five, and three years old. The children were placed in family foster care where they have since remained. At several subsequent review hearings, the parents' substance abuse, domestic abuse, criminal activity, and neglect and abuse of the children were documented.

In October 1990 a petition for termination of parental rights concerning all the children except the baby boy was filed. Following a hearing, the juvenile court terminated the parties' parental rights with their three oldest children.

The parents appeal the juvenile court's termination order, claiming there was not clear and convincing evidence to support termination of their parental rights and the termination was not in the best interests of the children.

■ Appellate review of termination proceedings is de novo. *In re W.G.*, 349 N.W.2d 487, 491 (Iowa 1984), *cert. denied*, 469 U.S. 1222, 105 S.Ct. 1212, 84 L.Ed.2d 353 (1985). We give weight to the findings of fact of the juvenile court, especially when considering the credibility of witnesses, but we are not bound by those determinations. *Id.* at 491–92.

■ The primary concern in termination proceedings is the best interest of the child. Iowa R.App.P. 14(f)(15); *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981).

We look to the child's long-range, as well as immediate, interests. We consider what the future holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care the parent is capable of providing. Our statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child.

*In re R.M.*, 431 N.W.2d 196, 199 (Iowa App.1988) (citing to *Dameron*, 306 N.W.2d at 745); *see also In re A.C.*, 415 N.W.2d 609, 613 (Iowa), *cert. denied*, 485 U.S. 1008, 108 S.Ct. 1474, 99 L.Ed.2d 702 (1987).

■ In the present case, the juvenile court found the children would be imminently likely to be abused and neglected if returned to their parents' custody. We must examine the record to determine whether there is clear and convincing evidence to support this finding.

The record reveals both parents have problems with substance abuse and lack suitable parenting skills. The marital relationship is extremely dysfunctional and is violent and abusive. The children reported fighting between the parents and drinking and drug use in their presence. T.P. admitted he injected drugs in front of the children. Domestic abuse was admitted by the mother, and she confirmed T.P. had struck N.V.M. in the head, causing the child to hit the wall. A child abuse report determined T.P. also physically abused J.V.M. causing the child to suffer a burn between his lip and nose. The report additionally concluded J.V.M. had been given an alcoholic drink by his father. C.V.M. stated her parents threatened to beat her if she informed social workers about the family situation. As a result of these incidents, the children demonstrate a great fear of their parents, particularly the father. For two years all three children have indicated fear of returning home. The only time they expressed their desire to return home was immediately prior to the termination hearing.

Extensive services, including a substance abuse program and a parenting program, were offered to the parents. When the petition to terminate parental rights was filed two years later, neither parent had satisfactorily addressed his or her problems.

To the mother's credit, she completed an inpatient substance abuse treatment program in 1989. Testimony conflicts, however, whether she has resumed using drugs since her release from the program. Nevertheless, it is undisputed she has not participated in recommended aftercare treatment.

T.P. initially refused to attend a substance abuse program. Subsequently, he entered several programs but did not complete treatment. In 1990 he was arrested for possession with intent to deliver methamphetamine. After pleading guilty to possession of an illegal substance, he admitted himself into inpatient treatment. He left this program stating he did not need treatment.

The family therapist reported T.P. and K.V.M. initially attended the parent education classes. However, by October 1988 their attendance became sporadic. By July 1990 the parents became uncooperative with the Department of Social Services and refused further services.

Also in July 1990, based on the allegations of C.V.M. and N.V.M. that they had been sexually abused by their father, a no-contact order was granted by the court. Although it was concluded these allegations were "undetermined," the children revealed a sexual knowledge far beyond their normal developmental levels suggesting, if they were not participants in sexual contact, they witnessed such contact.

The children's sophisticated level of knowledge about drugs and drug paraphernalia and procedures is astounding and frightening. C.V.M., in particular, was able to describe the use of a variety of drugs in addition to their usual hiding places in the home. All three children were diagnosed with over-anxious disorder of childhood attributable to their parents' actions.

The social worker who has provided services to these children for almost two years and the guardian ad litem for the children strongly recommended termination would be in the children's best interests. The social worker stated many of the children's problems, which resulted from events occurring before 1990, still remain. In the social worker's opinion, these problems will be perpetuated by long-term foster care. The family therapist who worked with T.P., K.V.M., and the children indicated due to the limited progress of the parents, it will be some time before their parenting abilities reach an acceptable level for the children to return home.

Although the parents have demonstrated the ability to provide for the basic needs of the youngest child currently in their custody, the record refects they are unable to provide for the more complex needs of the three oldest children: K.P. attended parenting classes, but has not been able to follow through with necessary changes. She can identify behavior patterns and formulate a plan to change, but is unable to implement the plan. T.P. has not effectively complied with the court's order to attend parenting classes. The parents are not able to agree on a course of action when interacting with or disciplining the children.

As noted by the juvenile court, "the three children in interest have waited essentially all of their lives for these adults to be adequate individuals and competent parents. To suggest that they should wait longer is not in their best interest." We agree with the juvenile court's assessment. The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems. *In re A.C.*, 415 N.W.2d 609, 613 (Iowa), *cert. denied*, 485 U.S. 1008, 108 S.Ct. 1474, 99 L.Ed.2d 702 (1987). Children should not be made to suffer indefinitely in parentless limbo. *Id.*

There is clear and convincing evidence supporting termination of T.P. and K.V.M.'s parental rights. We affirm.

AFFIRMED.

SCHLEGEL, P.J., concurs.

SACKETT, J., specially concurs.

SACKETT, Judge (specially concurring).

I concur because I think the trial court and the majority of this court have correctly applied the dictates of Iowa statutory and case law to the facts of this case and ordered termination.

I agree with the majority that these children have had to endure things in their parental home no child should have to endure. I consider the parents' early treatment of their children outrageous. I recognize the children cannot today be returned to their parental home without considerable assistance. But while these parents have had serious problems with substance abuse, they have made considerable strides to correct the problems and currently are considered capable of parenting a younger sibling of these three children. They are slowly making progress and, with help, there is evidence the family unit can be restored.

I am convinced children have the best chance if the state is able to help solve the serious problems of their biological family and preserve the family. I find considerable support for this position. I recognize saving the biological family is not always possible and, even if possible, frequently is very difficult.

In recent years we have turned to terminating parental rights where, as in this case, parental problems are not solved in the statutorily mandated time frame. The common law starting with the creation of man and woman established parents' rights to raise their biological children. Contrary to this common law, we have in the past decade, driven by a legitimate need to protect children, terminated parental rights in a large number of cases. But termination of parental rights is an area we have entered with little or no history or direction. A termination court rarely has the whole picture, but faces issues of termination with little or no evidence of what future the child may have after termination.

What I continue to learn about the difficulty of finding satisfactory adoptive

homes for children with the profile of these children convinces me I can make no assumption that a child will have a happier and more stable environment following termination.

These children, now nearly nine, seven, and five, know and are bonded to their parents. The children's biological and emotional ties to their natural parents will not be severed by this legal termination of parental rights. These children carry scars from their turbulent childhood. If adopted, there is no promise of success in a new family setting. If adopted, they will carry into their adoptive homes the unresolved problems with their natural parents.

Do we offer these children the best chance for the future by terminating parental rights, hoping they will experience a successful adoption and emerge as emotionally secure adults? Would they have a greater chance of emerging as emotionally secure if we continue to work with their family unit to help them understand their parents' drug abuse, help their parents correct the problems, and preserve the biological unit? I have concurred in affirming termination without being able to answer these questions. The answers are not available to me under this record, and I am limited to the record before us.

I have a second concern. As I understand this proceeding, it also relieves the parents of their duty to support these children. Are we fair to the children in cutting off their right to financial support from their parents? Unless adopted, and possibly even if adopted,[1] the state will assume a substantial obligation for their support. I question the justification for relieving the parents of this responsibility.

I hope the legislature and the courts of this state recognize the lack of history in this area demands we constantly question and reexamine our position to assure state intervention in the lives of troubled fami-

lies is serving the best interests of the children.

---

1. **Financial Assistance.** The department of human services shall, within the limits of funds appropriated to the department of human services and any gifts or grants received by the department for this purpose, provide financial assistance to any person who adopts a physically or mentally handicapped, older, or otherwise hard-to-place child, if the adoptive parent has the capability of providing a suitable home for the child but the need for special services or the costs of maintenance are beyond the economic resources of the adoptive parent. Iowa Code § 600.17 (1991).